LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant, Richard Edward Argo, guilty of murder of “Paul Harbin, by shooting him with a pistol, in violation of § 13A-6-2 of the Alabama Criminal Code.” The trial court sentenced him to imprisonment for life.
The three-volume transcript of the proceedings in the trial court contains four hundred and sixty pages, but a relatively small number of pages are devoted to the testimony of witnesses as to what occurred at or about the time and place of the alleged crime, which evidence chiefly consisted of undisputed proof of the fact that some time after midnight and before 3:00 A.M. on the night of December 26-27,1982, the victim was killed by being shot six times by a pistol, three of the bullets entering the front of the body and three the back of the body, the body being first discovered while it was lying on the floor of a store. No witness testified as an eyewitness to the occurrence, but the State succeeded in introducing in evidence a tape recording of the conversation between Lt. Melton, one of the investigating officers, and the defendant, which, according to the testimony of Officer Melton, was preceded by the officer’s giving to him the “Miranda warning.” A part of the conversation between the two was, according to the testimony of the defendant at a voir dire hearing out of the presence of the jury, as follows:
“Q. Did Melton tell you it was in your control or you could prevent Marie Harbin [the widow of the victim] from being arrested and charged with murder in this case?
“A. In an about way he did, yes.
“Q. How, in an about way, did he tell you that?
“A. He told me if I would tell him the truth of what happened to Paul Harbin and how I was involved in it, that he would not mess with her and would not arrest her.
“Q. And did you respond you would tell him anything?
“A. I told him I would tell him anything that he wanted to hear, that I would tell him the truth. At that time, I — I told the man anything for him to leave her alone. I would have told anybody that.
“Q. Did you feel like it was in your power to protect Marie in some fashion?
“A. That is the only way that I saw that I could protect her. He was threatening to arrest her and put her in jail and I knew she couldn’t handle it.

“Q. You had denied any involvement in this case or any knowledge about this case or about the 27 pages here of questions from Sgt. Melton. Now, was what you told him about going out there and killing Paul Harbin, was that the truth or not the truth?
*633 “A. No, sir, it was a lie.
“Q. And why did you tell that lie, Richard?
“A. To protect Marie where he would leave her alone.
“Q. Did Sgt. Melton tell you that he would not arrest Marie if you would cooperate with him and talk to him; did he make that statement?
“A. He made the statement that if I would tell him the truth of what happened that he would not go out there and arrest Marie and put her in jail and charge her with murder. And when he made that statement is when I turned around made the statement that I made.
“Q. And that statement was not true?
“A. No, sir, that statement was not true. I did not kill Paul Harbin.”
At the sentencing hearing, defendant continued to insist that he was innocent of the crime charged against him. When the sentence was pronounced by the trial judge, the following occurred:
“THE COURT: Now, I take it you are indigent, you told me that in a note that you wrote me.
“THE DEFENDANT: I am what?
“THE COURT: Without funds.
“MR. SHEFFIELD [Defendant’s trial attorney]: Unable to hire a lawyer or unable to pay for a transcript.
“THE DEFENDANT: Yes, sir.
“THE COURT: All right, sir. I will advise you now you have a right to appeal. And, of course, you want to appeal; is that right?
“THE DEFENDANT: Definitely.
“THE COURT: All right. I will appoint you a lawyer and give you a free transcript.”
The attorney appointed by the court and who has filed a brief for him on appeal filed a motion for a new trial in the trial court and on the hearing of the motion made a strong argument to the trial court, which he does on appeal, to the effect that the confession, the incriminating statements, of defendant to Officer Melton should not have been admitted in evidence over the objection of the defendant.
We now consider the only two issues raised in the brief of counsel for appellant. The first issue is thus captioned:
“THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT’S MOTION FOR EXCLUSION OF INVOLUNTARY ADMISSIONS AND CONFESSION IN THAT THERE WAS NO VOLUNTARY KNOWING INTELLIGENT WAIVER OF HIS RIGHTS.”
Diligent counsel on appeal has cited a number of cases of the Supreme Court of the United States, as well as the Alabama Supreme Court and other appellate courts of Alabama, in support of Issue One, which we consider authoritative but which, we think, do not support the contention made by appellant by the first issue presented. According to the typed transcript of the tape that was recorded of the officer’s interview of defendant, there was nothing stated by Lt. Melton that was substantially the same as the testimony of defendant to the effect that unless defendant admitted his guilt of the murder of Paul Harbin, Officer Melton, who was a sergeant at the time, stated in effect that he would see to it the prosecution would be commenced against Marie Harbin for the murder of her husband. Unfortunately, however, it is undisputed that at times there was conversation between the officer and defendant that was not recorded on the tape recorder. There was a lengthy argument by the attorneys for the State and the defendant on the trial of the case of defendant’s motion to suppress the incriminating statements, referred to at times as the confession of defendant, in which it was clearly made known to the trial judge that Officer Melton’s testimony as to what he said to defendant when he confessed that he had killed the victim was in conflict with what defendant testified Officer Melton told him. The trial judge had the opportunity to see as well as to hear both witnesses as they testified on the point. One of the attorneys for defendant, in his argument to the court in support of his contention that the confes *634 sion should be suppressed, stated the following:
“The only two people that were there, of course, is Melton and Mr. Argo, of course. So, of course, Sgt. Melton says one thing and Richard Argo says something entirely different.”
From that point in the argument of counsel for defendant and for about two pages of the transcript, the particular attorney for defendant and the trial judge conducted a dialogue, which we omit for sake of brevity in this opinion, but now resume the dialogue as follows:
“THE COURT: George [the first name of the defendant’s attorney arguing the matter], to be honest with you, if I thought Melton told this man that, you would get all the way to home base.
“MR. LUCAS: All right. So, I presume that you are dismissing the testimony of the Defendant out of hand?
“THE COURT: I am weighing his testimony, George, I am weighing it. I have got to weigh it. I am assigning weight to it.
“MR. LUCAS: I understand."
The dialogue between the trial judge and the attorney for defendant continued for at least three more pages, during which the trial judge stated:
“I am satisfied that it didn't, George. And just so you will know that I’m not just shooting from the hip, I want you to know that I have listened carefully to this statement and I have listened to the inflections in the voices, the intonations; your man was responsive, I think, to the questions Melton posed to him. And I am satisfied, as well as I can be, from an objective criterion, as well as my subjective opinion of Melton’s high character, that Melton is telling the truth about this matter.”
During less than a page thereafter of the transcript, the following occurred:
“THE COURT: Well, George, I appreciate the zeal with which you have pursued this question, but I am going to let the statement [the confession or incriminating statement] in.
“MR. SHEFFIELD [One of the two trial attorneys for defendant]: We would reserve an objection, of course, for the record.”
We believe that we have quoted enough of the transcript to make it clear that the trial judge believed the testimony of Officer Melton and disbelieved the testimony of the defendant as to whether Officer Melton induced the defendant to admit that he had killed the victim by threatening to arrest and charge Marie Harbin, the decedent’s widow, with the murder of her husband. Even if we were to come to a different conclusion from the trial court as to the issue now under consideration, which we do not, it would not be within our province to decide this issue in favor of the appellant, for reasons stated by Judge Tyson in Harris v. State, 420 So.2d 812, 814-815 (Ala.Cr.App.1982), as follows:
“When the evidence on the circumstances surrounding a confession is conflicting on voir dire, the trial judge must determine its admissibility. If admitted, the controverted testimony for the accused goes to the jury on the confession’s credibility. The trial judge need only be convinced from a preponderance of the evidence to find a confession or inculpatory statement to have been voluntarily made. The totality of the circumstances determines whether the accused has knowingly and intelligently waived his rights to assistance of counsel and to remain silent. Where the trial judge finds on conflicting evidence that the confession was voluntarily made, its finding will not be disturbed on appeal unless found to be palpably contrary to the weight of the evidence. A voluntariness predicate laid by the State is sufficient to establish prima facie that a confession was voluntarily made. Myers v. State, 401 So.2d 288 (Ala.Cr.App.1981); Simpson v. State, 401 So.2d 263 (Ala.Cr.App.), cert. denied, 401 So.2d 265 (Ala.1981); and cases cited therein.”
The only other issue presented in the brief of counsel for appellant is thus captioned:
*635 “THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT’S MOTION FOR JUDGMENT OF ACQUITTAL IN THAT THE STATE DID NOT PROVE VENUE.”
Prior to the time the State rested its case, there were repeated references in the testimony to the place where the victim was killed at the “U-Totem Store that is on East Lake Boulevard.” It is also to be noted that before the State rested its case, Officer Melton had testified and identified himself as an officer of the Birmingham Police Department at the time of the trial and at the time of the investigation of the death of Paul Harbin. The appellate courts of Alabama have uniformly held in numerous cases that they take judicial knowledge of the names of the counties in Alabama in which cities and towns, and even well known unincorporated places, are located. See West’s Alabama Digest, Criminal Law, Key No. 304(6). The second issue presented in brief of counsel for appellant is not well taken.
Before concluding our opinion in this case, we think we should note that the attorney for Richard Edward Argo on appeal and the attorneys representing him on the trial of this case have impressively made a strong argument in his behalf, particularly as to the first issue presented on appeal, by emphasizing the subnormality of body and mind of the defendant-appellant. The transcript shows that such subnormality consists of a severe injury and disfigurement of his face as a result of a shotgun wound, which had occurred prior to the crime involved in the instant case, and mental impairment therefrom that has caused him to have psychiatric treatment, as to which he testified in part as follows:
“Q. Are you taking medication now for these problems you have with your face?
“A. Yes, sir, constantly.
“Q. Now, how far did you go in school?
“A. I think I quit when I was in the Sixth Grade, so I finished the Fifth and was in the Sixth when I quit.
“Q. Do you know what your IQ is? Have you ever had an IQ test?
“A. No, sir, not to my knowledge I haven’t. I don’t know, I might have, but I don’t remember.
“Q. Now, has your injury to your face or your psychological problems affected your ability to respond under pressure or any pressure type situation?
“A. Tremendously it affected me.

“Q. The pressure problem that you have, your inability to handle pressure, have you received psychiatric treatment for that?
“A. No, I have tried — since I have been locked up I have tried to get psychiatric care here, but I have only seen the psychiatrist three times the whole time I have been here. And they just give me something to help me sleep at night and that is it.”
We hope that this reference to defendant’s physical and mental condition will be of benefit to appellant and to those who have charge of him or will be in contact with him in the future.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.